UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————————————X

KUMARANAYAGAM BALAKRISHNAN,

                Plaintiff,

    -against-

BETTY KUSEL, RICHARD W. JENNY,
Ph.D., STEPHANIE H. SHULMAN, M.S.,
DEIRDRE ASTIN, and EILEEN HEAPHY,

                Defendants.

———————————————————————————X

**MEMORANDUM**
**DECISION AND ORDER**

08-cv-1440 (BMC)

**COGAN, District Judge.**

This case is before the Court on defendants' motion for summary judgment. For the

reasons set forth below, the motion is granted in part and denied in part.

## BACKGROUND

The Court has taken the facts set forth herein from the parties' affidavits, exhibits, and

Rule 56.1 statements, viewed in the light most favorable to plaintiff as the non-moving party.

See Capobianco v. City of New York, 422 F.3d 47, 50 n.1 (2d Cir. 2001).[1]

Plaintiff has been licensed to practice medicine in New York State since 1973.

Beginning in 1976, plaintiff worked as a laboratory director and blood bank director at Coney

Island Hospital in Brooklyn, New York. His actual employer during this time was UGMA, P.C.,

which provided services to the hospital. In 1988, plaintiff also began working as laboratory

director for Analytical Diagnostic Labs ("ADL"), a privately-owned clinical testing laboratory

serving nursing homes and similar facilities in the New York metropolitan area.

---

[1] The Court notes that plaintiff's affidavits contain numerous conclusory and opinion statements by lay witnesses.
The Court has not considered this inadmissible evidence in reaching its decision.

New York requires laboratory directors to have a Certificate of Qualification ("CQ") covering the areas of testing in which the director is certified. A CQ is valid for two years; a director is responsible for submitting a renewal application to DOH to keep his CQ current. According to plaintiff, he had renewed his CQs every two years since he began working as a laboratory director "without any problem."

In late 2003, ADL's President, Gershon Sontag, began receiving complaints from the New York State Department of Health ("DOH") that ADL was allegedly performing illegal forensic toxicology testing.[2] As part of its inquiry into the forensic toxicology and other complaints against plaintiff, defendant Kusel – Director of Regulatory Affairs at the DOH's Wadsworth Center for Laboratories – scheduled numerous surveys and investigations of ADL. According to defendant Heaphy – a senior investigator in the DOH's Laboratory Investigative Unit and one of Kusel's subordinates – she was also asked to investigate other potential regulatory violations during this time, including allegations that ADL had referred a number of its own clinical tests to Coney Island Hospital, that an employee of both ADL and Coney Island Hospital (not plaintiff) had brought ADL proficiency tests, meant to be performed at ADL, to be performed instead at Coney Island Hospital, and that ADL had possibly employed illegal aliens from Pakistan as laboratory technicians.[3]

---

[2] According to DOH, ADL was testing specimens for drugs without following mandated chain of custody procedures. According to Sontag, although ADL did conduct clinical *non-forensic* toxicology testing for one of its nursing home clients, its laboratory reports explicitly disavowed any forensic testing, stating that specimen analysis was performed without chain of custody handling, and thus that test results should not be used for legal or employment evaluation purposes.

[3] Specifically, in an on-site investigation of ADL on August 2, 2006, DOH investigators questioned Pakistani-born laboratory employees about their citizenship and immigration status, and whether their families were legally in the United States. Additionally, in a June 14, 2006 email, defendant Dr. Jenny – director of the DOH Clinical Laboratory Evaluation Program – had directed defendant Astin – head of DOH's Laboratory Certification Unit – to review ADL's personnel roster "for new hires and prevalence of Pakistani imports."

Because plaintiff's CQ was due to expire on December 21, 2004, he submitted a renewal application for his CQ in August of that year. In September, Kusel advised plaintiff that the processing of his CQ application was delayed because of the ongoing investigation of ADL.[4] Likewise, Defendant Astin – head of DOH's Laboratory Certification Unit – sent plaintiff a letter pursuant to Article 44 of the New York State Administrative Procedure Act ("SAPA") on December 15, 2004, confirming receipt of plaintiff's renewal application but advising him of the delay in reviewing the application. This letter (the "SAPA letter") stated that because an existing license does not expire until a timely-received application for renewal has been finally determined by the agency, plaintiff's current CQ was still valid, and he could "therefore accept a position as laboratory director with responsibilities in the same categories as the existing [CQ], pending completion of our review."[5]

DOH's regulatory investigation continued from 2004 through 2007. In December of 2005, ADL entered into a settlement with the DOH regarding the allegedly improper forensic toxicology screenings; the laboratory paid a $3,000 fine but admitted no wrongdoing. However, in early 2006, Kusel and Dr. Jenny proposed personal administrative charges against plaintiff and "punitive action against the [CQ]" based on the allegedly improper forensic testing at ADL. Although plaintiff resigned from ADL in April 2006 (effective June 2006),[6] some of the defendants apparently continued to withhold his CQ and pursue these proposed charges against

---

[4] According to Kusel's declaration, DOH had placed ADL (and its directors, to the extent they were responsible for ADL's performance) on "technical watch," indicating that the laboratory and its directors were subject to more frequent surveys and inspections than other laboratories. Internal case notes from DOH indicate that a hold was placed on plaintiff's CQ renewal on September 17, 2004 because of the forensic toxicology charges.

[5] Despite this language, plaintiff – and defendants Shulman and Dr. Jenny – testified that an individual who possesses only a SAPA letter instead of a CQ could potentially face problems obtaining employment. However, plaintiff also testified at his deposition that no prospective employers told him they would not hire him because of his SAPA letter.

[6] In an email from Shulman to another DOH employee on April 11, 2006, Shulman opined that plaintiff's resignation from ADL was a "smart decision on his part...."

3

him. On April 24, 2006, DOH's Health Program Administrator emailed Kusel, Shulman, Dr. Jenny, and other DOH employees about plaintiff's renewal status; the administrator stated that because she "was advised that [plaintiff] was to remain on hold, no action has been taken on his CQ."

Then, on August 22, 2006, Kusel sent an email to Heaphy and Dr. Jenny stating that plaintiff had two options with respect to the threatened charges against him: "admit to not fulfilling his duties as a director because he is incompetent or unwilling to comply – at which case we take away his CQ --- OR --- he can fall on our mercies that the owners of ADL did not allow him to fulfill his duties – at which point we may be able to show some leniency." On December 4, 2006, Kusel sent an email to Shulman asking about plaintiff's "CQ cycle" and whether DOH could "settle the old charges [against plaintiff] . . . and issue a CQ that would be very close to expiring." Kusel stated she "would be willing to allow that, as it would be more of a nice surprise when he's included in the ADL charges." According to plaintiff, he met with Kusel more than once regarding these proposed charges; he states Kusel made clear to him during these meetings that if he "cooperated" with DOH and testified against ADL, the potential charges would likely never be brought.[7]

Despite the pendency of these proposed charges and the fact that he still had only a SAPA letter instead of a formal CQ, plaintiff was hired by the Brooklyn Hospital Center in April of 2006 as an assistant laboratory director.[8] Plaintiff earned a salary of $100,000 per year for his part-time work at the hospital; he had earned only $40,000 per year for his part-time work at

---

[7] Similarly, in April 2007, Dr. Jenny emailed Kusel regarding charges proposed against Dr. Matthew Pincus, another of ADL's lab directors. According to Dr. Jenny, "Dr. Pincus called and 'reminded' me that [Kusel] intimated no recrimination if he backoff [sic] as director."

[8] On April 14, 2006, Shulman sent plaintiff a letter (copying the Laboratory Director of Brooklyn Hospital and a member of the hospital's administration staff) stating that DOH "find[s] that concerns have been raised in the past about your lack of active involvement in the laboratories under your direction," and asking plaintiff to "provide justification for [DOH's] approval of your request to become assistant director at the Brooklyn Hospital Center. . . ."

ADL. Plaintiff was asked to resign from this position in early 2007 for what the hospital described as "budgetary reasons."

Throughout this time, plaintiff also still held his position as laboratory director at Coney Island Hospital. Heaphy had also been conducting an investigation during this time into the relationship between plaintiff, ADL, and the hospital. Her investigation focused primarily on allegations that the hospital had performed testing on ADL blood samples after DOH had withdrawn ADL's hematology permit, as well as alleged billing irregularities during plaintiff's tenure as lab director.

Specifically, the final report of Heaphy's investigation (dated August 19, 2007) reveals that she had been assigned to investigate the performance of specimen testing for ADL specimens by the laboratory at Coney Island Hospital even though ADL was an "independent laboratory that was not an account of the hospital."[9] Because ADL did not have an account with the hospital, these specimens were never logged into the hospital's record-keeping system, and the hospital apparently never negotiated a contract rate with ADL for performance of the testing. However, according to Heaphy's report, she learned from plaintiff's assistant that plaintiff had asked her to prepare a bill using the hospital's negotiated rate for another laboratory ($5 per test) for 2,739 tests forwarded by ADL to the hospital.

Heaphy's report further noted that she brought this bill to the attention of the hospital's Controller and Chief Financial Officer. After the CFO "expressed outrage" at the situation, the report stated that Heaphy made clear to the CFO that "Dr. Balakrishnan was the Director of record for over eighteen years of the laboratory listed on the prepared bill [ADL]." Similarly,

---

[9] According to Heaphy's report, ADL had requested that Coney Island Hospital perform hematology testing services around the time DOH had voided ADL's hematology permit in September and October 2006. Plaintiff apparently told Heaphy that there was no written contract with ADL for this testing, and that a verbal agreement had been made between him and ADL.

Heaphy showed the bill to the hospital's Chief Operating Officer and informed the COO of plaintiff's affiliation with ADL; she also informed the COO of other dealings between ADL and the laboratory at Coney Island. The COO responded that the hospital would conduct its own investigation and refer the matter to the Inspector General for criminal prosecution if necessary. At some point during the investigation, a DOH employee informed the New York Post that an investigation was ongoing.

According to plaintiff, because of these investigations and rumors that defendants had caused an investigation of him by the Inspector General of the New York City Health and Hospitals Corporation, he feared that his pension and employment "were being jeopardized," and thus he had to leave his position. Although plaintiff's retirement letter, which he submitted to UGMA, P.C., stated that he would be "retiring effective [August 14] for family and health reasons," plaintiff's declaration clarifies that his "health reason" was that he "was on the verge of a mental health breakdown from the pressure exerted by Ms. Heaphy upon the officials at Coney Island Hospital to find some wrongdoing on my part."

## DISCUSSION

Plaintiff filed this action on April 8, 2008, asserting federal claims under § 1983 for violation of his constitutional equal protection rights, his right "to practice his chosen profession," his "property rights," and his "right to be presented with charges and a hearing held which could be defended." Plaintiff has also asserted a state common law action for malicious interference with his profession. Defendants have moved for summary judgment on the federal claims, arguing that (1) plaintiff's claims associated with his CQ are untimely; (2) plaintiff has failed to raise an issue of material fact as to any injury he suffered from defendants' alleged conduct; (3) plaintiff has failed to raise an issue of material fact regarding an equal protection

violation based on color or on a "class of one" theory; (4) plaintiff has failed to raise a factual issue as to whether defendants acted with malice; and (5) defendants are entitled to qualified immunity. Defendants have further asked the Court to refrain from exercising supplemental jurisdiction over plaintiff's state law claim in the event the Court dismisses his federal causes of action; they have also made substantive arguments against this claim.

Under Fed. R. Civ. P. 56(c), a court may not grant a motion for summary judgment unless "there is no genuine issue as to any material fact and [] the movant is entitled to judgment as a matter of law." The moving party bears the burden of showing that he is entitled to summary judgment. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986). The court's role at the summary judgment stage is not to resolve issues of material fact, but to discern whether any exist. See Gallo v. Prudential Residential Servs. Ltd., P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

## I. *Statute of Limitations*

First, defendants have asserted that any cause of action based on their alleged failure to issue plaintiff his renewal CQ is untimely. According to defendants, plaintiff's cause of action accrued when he received his SAPA letter in December 2004, and thus the three-year statute of limitations for § 1983 claims had run by the time he brought this action on April 6, 2008. Defendants have further asserted that plaintiff cannot rely on the "continuing violation" theory or other equitable tolling principles to make his claim timely. See Defts' Br. at 9 (citing, inter alia, Jaghory v. New York State Dep't of Educ., No. 95-CV-3478, 1996 WL 712668, at *5 (E.D.N.Y. Dec. 5, 1996) (rejecting plaintiff's argument that the denial of his medical license constituted a continuing violation)).

In response, plaintiff has asserted that "there is no such thing as a 'SAPA letter,'" and thus the letter plaintiff received in December of 2004 was not a legal event capable of commencing the running of the statute of limitations. Rather, according to plaintiff, defendants have harmed him by their continued failure to act on his application within the reasonable time guaranteed by SAPA § 301, and his right thereafter to have access to an appellate procedure and ultimately the courts upon a denial of his application

The Court concludes that plaintiff's equal protection action is timely – though not for the reasons advanced by either side. The Court neither agrees with defendants' assertion that plaintiff's cause of action is based solely on the SAPA letter he received in December 2004, nor accepts plaintiff's counterargument that his action concerns merely defendants' "failure to act" in processing his CQ renewal application. Rather, the Court reads plaintiff's complaint to assert an equal protection violation based upon defendants' allegedly malicious or otherwise improper conduct in actively withholding a decision on plaintiff's CQ renewal application to secure his "cooperation" with their objectives.

Construing plaintiff's CQ-related equal protection claims in this light, the Court finds that plaintiff's cause of action did not accrue until at least early 2006, when defendants decided to pursue "punitive action" against plaintiff's CQ and individual charges against plaintiff, and continued to withhold his CQ, despite having settled the forensic toxicology charges against ADL without any admission of wrongdoing by the laboratory. Thus, the three-year statute of limitations had not run when plaintiff filed his complaint in April of 2008, and the Court denies defendants' motion to dismiss plaintiff's CQ-related equal protection claims as untimely.

## II. *Plaintiff's Equal Protection Claim*

Having concluded that plaintiff's claims are timely, the Court will address each of the potential equal protection violations plaintiff has asserted.

### a. "Class of One" Claim

First, plaintiff has asserted an equal protection claim under a "class of one" theory, essentially arguing that defendants treated him differently from other similarly situated laboratory directors without rational basis. A "class of one" claim requires a plaintiff to demonstrate (1) that he was treated differently from individuals similarly situated in all relevant respects; (2) that defendants treated him differently with no rational basis; and (3) that the differential treatment he received resulted from non-discretionary state action. See Engquist v. Oregon Dep't of Agriculture, __ U.S. __, 128 S.Ct. 2146, 2153-54 (June 9, 2008); Marino v. Shoreham-Wading River Central Sch. Dist., No. CV-08-0825, 2008 WL 5068639, at *7 (E.D.N.Y. Nov. 20, 2008) (applying Engquist's construction of a "class of one" claim outside the public employment context); Sloup v. Loeffler, No. 05-CV-1766, 2008 WL 3978208, at *15-16 (E.D.N.Y. Aug. 21, 2008) (same).

Although the Court finds that plaintiff has raised a genuine issue of material fact regarding whether he was treated differently from other similarly-situated laboratory directors, and whether defendants possessed a rational basis for treating him differently, plaintiff has failed to raise a genuine issue of material fact as to whether any differential treatment he received resulted from non-discretionary state action. DOH medical licensing decisions are the product of subjective review, investigation, and analysis of a laboratory director's qualifications, and DOH officials are vested with discretion in making these decisions. See 10 N.Y.C.R.R. 19.3 (discussing the factors that should be considered in CQ determinations); N.Y. PUB. HEALTH L. §

573 (discussing qualification requirements for issuance of a CQ); Daxor Corp. v. State Dep't of Health, 90 N.Y.2d 89, 98-99, 659 N.Y.S. 2d 189 (1997) (discussing DOH discretion in medical licensing even on what was essentially a renewal application).

Plaintiff has offered the affidavit of Mary Anne Kowalski, former DOH Director of Regulatory Affairs / Health Program Director, to support the conclusions that decisions on CQ renewals are "not in any way discretionary" and rather are "simply ministerial." Kowalski's affidavit undercuts her own conclusions by making it clear that DOH employees make CQ decisions on a case-by-case basis after evaluating a director's education, experience, and other relevant information, including the results of any DOH investigations into potential regulatory violations.[10] There are no fixed rules defining when these considerations, singly or collectively, require the issuance or denial of a CQ, and therefore their assessment and balancing is inherently discretionary. Because any disparate treatment regarding the withholding of plaintiff's CQ is thus the product of discretionary state action, his "class of one" claim fails as a matter of law.

### b. Racial Discrimination Claim

Next, plaintiff has asserted a race-based equal protection claim. Specifically, his complaint alleges that "defendants are racists and discriminated against brown-skinned people." In support of this claim, plaintiff relies on Dr. Jenny's 2006 email discussing the presence of

---

[10] Plaintiff has contended that "[e]ven if the decision to issue or deny a CQ renewal involves discretionary aspects . . . the defendants have absolutely no discretion under the law as to whether they must act on an application." However, the time period for when DOH must act on a renewal application is also a matter of agency discretion because neither the statute nor the corresponding regulatory provisions set forth a definitive time frame for acting on a renewal application, or a limit on the authority of DOH to act after the expiration of a given time period. Cf. In re Court Reporting Institute Inc. v. N.Y. State Educ. Dep't, 237 A.D.2d 1, 4, 659 N.Y.S.2d 930 (3d Dep't 1998) (noting in the context of education licenses that even where the statute *does* contain an express time limit for agency action, the "[l]imits regarding the time within which an administrative agency must act 'are generally construed as discretionary in the absence of express limits on the authority of the agency to act after the time period'"). Furthermore, the provisions of SAPA § 401 (providing that an existing license remains valid pending a final decision by the agency on any renewal application) would be rendered superfluous if DOH had a non-discretionary duty to issue a renewal license within a specified time frame. In any event, Kowalski's affidavit makes clear that CQs may be withheld pending the results of a DOH investigation.

"Pakistani imports" at ADL, Heaphy's August 2006 on-site inspection of ADL (which plaintiff likens to an "immigration raid" based on Heaphy's direction that video cameras be placed outside the doors to catch any fleeing personnel), the related questioning of two Pakistani lab workers (whom plaintiff refers to as "brown-skinned employees of ADL") as to their immigration status, [11] and Kusel's complaints that ADL lab director Dr. Ming Liu had an insufficient command of the English language. However, in his declaration, plaintiff stated that he believed he "was being singled out and discriminated against by these defendants because [he] was employed as a director at ADL."

Without circumstantial evidence of defendants' intentional racial discrimination against plaintiff, these general contentions of "racist" behavior do not give rise to a genuine issue of material fact. See Morris v. Yale Univ. Sch. Of Med., 477 F. Supp. 2d 450, 461 (D. Conn. 2007) (granting summary judgment where the record contained no evidence "supporting plaintiff's claim of intentional race discrimination which rises above mere speculation or conclusory assertion based on a belief or hunch"); Bayon v. State Univ. of New York at Buffalo, No. 98-CV-0578E, 2004 WL 625133, at *2 (W.D.N.Y. Feb. 6, 2004) (granting summary judgment for defendants where plaintiff had alleged racial discrimination based on, inter alia, allegations that defendant commented on potential students' command of English because "command of the English language is a neutral criterion that does not discriminate on the basis of race or national origin"). Therefore, summary judgment is also appropriate for defendants on this portion of plaintiff's equal protection claim.

---

[11] As indicated above, Heaphy stated that DOH had heard specific allegations that ADL may have been hiring illegal aliens from Pakistan to work as laboratory technicians. See supra at note 3 and accompanying text.

c. Selective Enforcement Claim

Next, although plaintiff does not describe it as such in his complaint or his brief, he may also be attempting to articulate an equal protection claim based on selective enforcement of state regulatory procedures. To state a cause of action for selective enforcement, plaintiff must demonstrate: (1) he was treated differently from others similarly situated; and (2) the different treatment was based on "impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." LaTrieste Restaurant & Cabaret Inc. v. Village of Port Chester, 40 F.3d 587, 590 (2d Cir. 1994).

At the outset, the Court notes it is not entirely clear whether the selective enforcement cause of action as articulated in LaTrieste still exists in light of the Supreme Court's "class of one" jurisprudence as set forth in Engquist, supra, and Village of Willowbrook v. Olech, 528 U.S. 562, 120 S.Ct. 1073 (2000). The Second Circuit has not definitively resolved this issue, see Prestopnik v. Whelan, 249 Fed. Appx. 210, 213 n.1, 2007 WL 2389678, at *2 n.1 (2d Cir. Aug. 16, 2007) (noting "possible tensions between LaTrieste and Olech and its progeny today"); Osborne v. Fernandez, No. 06-CV-4127, 2009 WL 884697, at *40 & n.9 (S.D.N.Y. Mar. 31, 2009) (citing Prestopnik and recharacterizing plaintiff's selective enforcement claim as a class-of-one claim),[12] and the courts are mixed in their analyses of these claims. Compare Osborne, 2009 WL 884697, at *40 (recharacterizing selective enforcement claim); with Sloup, 2008 WL 3978208, at *14 n.18 (noting tension and analyzing claims separately); see also Bizzarro v. Miranda, 394 F.3d 82, 86-88 (2d Cir. 2005) (noting the unresolved question and stating that

---

[12] Prestopnik and other Second Circuit opinions have addressed only whether Olech invalidated the requirement that a plaintiff must allege a defendant's malice or ill will to establish an equal protection violation. See also Harlen Assocs. v. Village of Mineola, 273 F.3d 494, 499-500 (2d Cir. 2001) (questioning, but not deciding, whether Olech eliminated the malice requirement and characterizing a selective enforcement claim as a type of "class of one" claim). However, Engquist has likely added another facet to this inquiry – whether a selective enforcement cause of action, assuming this cause of action remains valid at all, exists where a plaintiff pleads disparate treatment as the result of discretionary state action.

selective enforcement claims are "lodged in a murky corner of equal protection law in which there are surprisingly few cases and no clearly delineated rules to apply") (citing LeClair v. Saunders, 627 F.2d 606, 608 (2d Cir. 1980)). Mindful of this tension, but in an abundance of caution, the Court has analyzed plaintiff's selective enforcement claim as a separate cause of action.

The Court finds that plaintiff has raised a genuine issue of material fact as to whether he was treated differently from other similarly-situated laboratory directors regarding the lengthy withholding period for his CQ and the nature/scope of the DOH investigations into the alleged regulatory violations committed by plaintiff or the laboratories he directed. Although plaintiff must show an extremely high degree of similarity between himself and the allegedly comparable individuals to establish this element, the inquiry as to whether parties are similarly situated is fact-specific, and summary judgment is only appropriate where "no reasonable jury could find that the persons to whom the plaintiff compares [himself] are similarly situated." Clubside, Inc. v. Valentin, 468 F.3d 144, 159 (2d Cir. 2006); Osborne, 2009 WL 884697, at *40 (construing plaintiff's selective enforcement cause of action as an equal protection class of one action and citing Valentin for the appropriate similarly-situated standard).

Here, the record contains a list of specific laboratory directors – including plaintiff – who have been placed on technical hold/watch since 1998 and any periods during which their CQs were placed on hold or compliance hold.[13] Neither party has attempted to explain the circumstances underlying each of these other laboratory directors' CQ holds, and the Court declines to speculate on what led to the CQ hold period for each director on the list. However, the Court notes that on its face, the list indicates that plaintiff's CQ hold period (at this point,

---

[13] Defendants produced this list as a response to plaintiff's first set of interrogatories.

over 4 ½ years) appears longer than a significant majority of the other laboratory directors'. Additionally, plaintiff has distilled this information into a shorter list of laboratory directors who are currently on CQ hold or compliance hold. [14] On this shorter list, attached as an exhibit to his declaration, plaintiff has identified nine laboratory directors presently located in New York State who are without CQs, and he has asserted that of these nine, his CQ has been withheld the longest without formal charges having been brought against him.

This information gives rise to a genuine issue of material fact as to the disproportionate length of plaintiff's CQ hold compared to other laboratory directors – and whether the DOH investigations of potential regulatory violations at ADL and Coney Island Hospital (which purportedly led to this lengthy waiting period for issuance of the renewal CQ) were somehow longer, more in-depth, or otherwise different from the investigations of the other laboratory directors on CQ hold. Questions also exist as to why DOH never brought formal charges against plaintiff, and whether defendants perhaps chose not to issue formal charges so they could use the threat of charges as leverage to force plaintiff's "cooperation."

Additionally, plaintiff shares several key identifying traits with the laboratory directors from whom he has arguably been treated differently: they are all laboratory directors in New York, they have all had their CQs placed on hold, and they have all themselves been placed on technical hold or watch during the same general time period. Because a rational jury could find that these other laboratory directors are similarly situated to plaintiff in all relevant respects, it would be inappropriate for the Court to hold that plaintiff has failed to establish this element as a matter of law. See Sloup, 2008 WL 3978208, at *16 (finding plaintiff had met his burden of

---

[14] Although the original list of laboratory directors indicates that plaintiff was removed from CQ hold as of May 16, 2007, he purportedly still has yet to receive his renewal CQ. This gives rise to an additional factual question as to why DOH is still withholding a decision on his renewal application.

showing that an individual was "prima facie identical in all relevant respects" where plaintiff provided the individual's name and evidence that plaintiff and the other individual performed similar activities in the same general area and should have been subject to the same seizure of their property).

Furthermore, the Court finds that a factual issue exists as to whether any disparate treatment of plaintiff, as compared to these other laboratory directors, was motivated by a malicious or bad faith intent to injure plaintiff based on his affiliation with ADL. In reaching this conclusion, the Court recognizes that plaintiffs rarely succeed on this cause of action, primarily because of the level of malice that must be shown by a plaintiff to demonstrate a constitutional violation. See Bizzarro, 394 F.3d at 86-87 (collecting cases and stating that defendants will not be liable if their "motivation to punish is to secure compliance with agency objectives;" rather, a successful plaintiff must establish that the government actor was motivated by reasons "wholly unrelated to any legitimate state objective").

However, the Court finds that the record here contains enough evidence for a reasonable juror to find that plaintiff has met this burden. The record contains statements, inter alia, that defendants wanted to make plaintiff "fall on [their] mercies" unless he admitted his incompetence, and that they wanted to "surprise" him by including him in charges after issuing him a nearly-expired CQ. It is, frankly, incomprehensible to the Court why a public servant like Kusel, entrusted with such important responsibilities, would engage in such petty and vindictive rhetoric. These statements evince something beyond a mere "spiteful mood," see LeClair, 627 F.2d at 610-11, or frustration motivated by the desire to see an investigation succeed, see Bizarro, 394 F.3d at 87. Instead, they raise questions about whether defendants' conduct rose from a bad-faith intent to injure plaintiff personally or professionally, rather than simply trying to

15

ensure his compliance with state regulations governing laboratories and laboratory directors. Because of these questions, summary judgment is inappropriate, and the Court denies defendants' motion as to this cause of action.

### d. Defendants' Lack of Injury Defense

As a defense to all of these equal protection theories, defendants have asserted that plaintiff's claims must fail because he has not demonstrated any injury. First, defendants claim that plaintiff suffered no injury as a result of the withholding of his CQ and defendants' issuance of a SAPA letter. The Court agrees that plaintiff has not established actual monetary injury from the withholding of his CQ; indeed, the record demonstrates that plaintiff was able to obtain a higher-paying position with only a SAPA letter after he resigned from ADL in 2006. However, the law is clear that actual damages are unnecessary for a plaintiff to have standing to assert a constitutional violation. See, e.g., Carey v. Piphus, 435 U.S. 247, 266-67, 98 S.Ct. 1042 (1978) (holding denial of procedural due process warranted award of nominal damages even without proof of actual injury because "by making the deprivation of [constitutional] rights actionable for nominal damages without proof of actual injury, the law recognizes the importance to organized society that those rights be scrupulously observed; but at the same time, it remains true to the principle that substantial damages should be awarded only to compensate actual injury or, in the case of exemplary or punitive damages, to deter or punish malicious deprivations of rights"); Irish Lesbian & Gay Org. v. Giuliani, 143 F.3d 638, 651 (2d Cir. 1998) (finding plaintiff who had not suffered a compensable injury still had standing to bring claims because "[n]ominal damages are available in actions alleging a violation of constitutionally protected rights, even

without proof of any actual injury").[15]  Thus, the Court will not dismiss plaintiff's equal protection claims on this basis.

Next, defendants contend that plaintiff suffered no injury as a result of his allegedly forced retirement from Coney Island Hospital.  According to defendants, plaintiff's "only conceivable claim" based on these allegations sounds in constructive discharge.  They argue this claim must fail because defendants were not plaintiff's employer, and because no reasonable employee in plaintiff's position would have felt compelled to resign by Heaphy's investigation.

Although plaintiff's arguments are not well-articulated, the Court is not convinced that plaintiff has either attempted to assert a constructive discharge claim, or that constructive discharge provides the only possible lens through which to view plaintiff's assertions.  Rather, it seems from plaintiff's complaint and brief that he contends his allegedly forced retirement (from both ADL and Coney Island Hospital) came as an intended consequence of defendants' allegedly malicious efforts to injure him, and thus is tied to defendants' alleged equal protection violation.  Because questions remain regarding defendants' motivation, and the nature, scope, and propriety of the investigations and proposed charges involving plaintiff, the Court finds that plaintiff has raised a genuine issue of material fact as to whether defendants' conduct forced him to leave his employment at either or both laboratories, which may give rise to nominal, actual, and/or punitive damages.

e.  Defendants' Qualified Immunity Defense

Defendants have further asserted that plaintiff's equal protection claim should be dismissed because they are entitled to qualified immunity.  The doctrine of qualified immunity

---

[15] Without passing judgment on the ultimate merits of plaintiff's claim or opining as to a potential jury verdict, the Court notes that an award of nominal damages in a § 1983 action allows the jury to award punitive damages, which plaintiff seeks in his complaint.  See, e.g., LaBounty v. Rivera, No. 95 Civ. 2617, 1999 WL 1129063, at *7 (S.D.N.Y. Dec. 8, 1999) (citing Robinson v. Cattaraugus County, 147 F.3d 153, 162 (2d Cir. 1998)).

protects state officials from civil liability where (1) the conduct attributed to the official is not prohibited by federal law; (2) the plaintiff's right not to be subjected to such conduct was not clearly established at the time of the conduct; or (3) the official's conduct was objectively reasonable in light of clearly established legal rules. See Cuoco v. Moritsugu, 222 F.3d 99, 109 (2d Cir. 2000). Here, factual issues remain as to the objective reasonableness of defendants' conduct in (and motivation behind) withholding plaintiff's CQ and proposing charges against him, and the manner in which defendants undertook their investigation of alleged regulatory violations involving plaintiff. Thus, the same genuine issues of material fact that preclude summary judgment on plaintiff's selective enforcement claim also preclude a grant of qualified immunity at this point. See, e.g., Allen v. City of New York, 480 F. Supp. 2d 689, 710-11 (S.D.N.Y. 2007) (citing Hemphill v. Schott, 141 F.3d 412, 418 (2d Cir. 1998)).

### III.    *Plaintiff's Due Process Claim*

In his complaint, plaintiff alleged a claim for violation of his "property rights" and his "right to be presented with charges and a hearing held which could be defended." Defendants never argued against these claims in their motion for summary judgment, focusing instead on plaintiff's equal protection and state law claims. However, plaintiff relied heavily on this purported denial of his substantive and procedural due process rights in his opposition to defendants' motion.

According to plaintiff, because SAPA sets forth a specific period of time in which DOH must act on a license application, it creates a due process right in license applicants. Plaintiff has argued that defendants "made a mockery" of this right by failing to act on his CQ application within the set time period and instead issuing him a "SAPA letter." Plaintiff has contended that this procedure is a "gross perversion of the SAPA," and he has even gone so far as to assert that

18

"there is no such thing as a 'SAPA Letter'" -- he claims this is merely a tool invented by defendants to keep him in "open-ended perpetual limbo" as they denied his rights both to his renewal CQ and to any hearing on a denial of the CQ.

Having considered plaintiff's arguments, the Court finds that both plaintiff's substantive and procedural Due Process causes of action fail as a matter of law. First, any allegations that defendants violated plaintiff's property rights by failing to renew his CQ are meritless because plaintiff has no legitimate claim of entitlement to a renewal CQ. Although plaintiff has purportedly renewed his CQ since the 1970's without any issues, the CQ renewal process is still a product of DOH discretion, and thus it is far from automatic. Indeed, the New York Court of Appeals has made clear that the discretionary nature of DOH certification decisions defeats any claim of entitlement to a medical license on an application for renewal. See Daxor Corp., 90 N.Y.2d at 97-99 (finding a clinical laboratory had no property right in an initial or renewed license even though the lab had operated for years under a City license and provisional State licenses).

Likewise, plaintiff's arguments that defendants have violated his procedural due process rights guaranteed in SAPA § 301 (mandating a hearing in an adjudicatory proceeding "within a reasonable time") and 10 N.Y.C.R.R. § 51 (providing for a hearing for a license applicant or licensee whose license is threatened with revocation) also fail. Under New York law, a hearing is not required on a license *renewal* application, and thus § 301's guarantee of a hearing within a reasonable time does not apply to plaintiff's request to renew his CQ. See Daxor Corp., 90 N.Y.2d at 98 ("While existing licenses cannot be revoked without a hearing, there is no similar right for . . . renewals of licenses."); In re Richard I, Inc. v. Ambach, 90 A.D.2d 127, 130, 456 N.Y.S.2d 583 (3d Dep't 1982) (same).

Moreover, even assuming that plaintiff was entitled to a hearing, Second Circuit law is clear that a plaintiff may not assert a due process claim in a § 1983 action when he had an adequate state post-deprivation procedure to address the alleged violation of his process rights. See Beechwood Restorative Care Ctr. v. Leeds, 436 F.3d 147, 156-57 (2d Cir. 2006). Here, plaintiff never brought an Article 78 proceeding to challenge the denial of any process allegedly due on his CQ renewal application, and his failure to do so is fatal to his due process claim. See id. Thus, these causes of action must be dismissed as a matter of law.

## IV. *Plaintiff's State Law Malicious Interference Claim*

In his complaint, plaintiff has purported to bring a state common law claim for "malicious and intentional interference with [his] profession." Although this cause of action does not exist under New York law, the Court has considered two potential causes of action that may encompass plaintiff's allegations: (1) tortious interference with contractual relations; and (2) tortious interference with prospective economic advantage.[16]

### a. Tortious Interference with Contractual Relations

Under New York law, the elements of a claim for tortious interference with contractual relations are: (1) the existence of a valid contract between plaintiff and a third party; (2) defendants' knowledge of that contract; (3) defendants' intentional and improper procurement of a breach of that contract; and (4) resulting damage to the plaintiff from the breach. See Trionic Assocs., Inc. v. Harris Corp., 27 F. Supp. 2d 175, 185 (E.D.N.Y. 1998) (citing Lama Holding Co. v. Smith Barney, Inc., 88 N.Y.2d 413, 646 N.Y.S.2d 76 (1996)).

---

[16] Defendants have construed plaintiff's claim only as a claim for tortious interference with contractual relations and have argued that this claim fails as a matter of law. However, at least one other court in this district has considered both the contractual relations and prospective economic advantage causes of action when a plaintiff purported to allege a state law claim for "tortious interference with . . . career." See Millar v. Ojima, 354 F. Supp. 2d 220, 229-30 (E.D.N.Y. 2005). The Court has thus considered plaintiff's state law claim under both theories.

Viewing the facts in the record in the light most favorable to plaintiff, the Court finds that plaintiff has failed to raise a genuine issue of material fact as to these elements. Even assuming arguendo that plaintiff had employment contracts with ADL or UGMA, P.C., the record is devoid of evidence that any of the defendants knew of the existence of these specific contracts. The Court also notes that under New York law, an at-will employment contract cannot form the basis for a tortious interference with contract action. See Discover Group, Inc. v. Lexmark Int'l, Inc., 333 F. Supp. 2d 78, 84 (E.D.N.Y. 2004). Although there is no evidence in the record as to whether plaintiff's employment contracts were at-will, the Court can assume that plaintiff was an at-will employee in the absence of specific allegations to the contrary. See Millar, 354 F. Supp. 2d at 230.

Moreover, in a tortious interference with contract action, "it is axiomatic that there must be a breach of that contract by the other party," Trionic Assoc., Inc., 27 F. Supp. 2d at 185 (citing Jack L. Inselman & Co. v. FNB Fin. Co., 41 N.Y.2d 1078, 1080, 396 N.Y.S.2d 347 (1977)), and the plaintiff must "identify a specific contractual term that was breached." Millar, 354 F. Supp. 2d at 230 (citing Risley v. Rubin, 272 A.D.2d 198, 199, 708 N.Y.S.2d 377 (1st Dep't 2000)). Here, plaintiff has not shown the breach of any specific term of his employment contract by either ADL or UGMA, P.C. Rather, the evidence demonstrates that plaintiff preemptively chose to resign from both of these employers and thus terminate his employment relationships himself. These facts do not give rise to a tortious interference with contract claim.

### b. Tortious Interference with Prospective Economic Advantage

A claim for tortious interference with prospective economic advantage requires a plaintiff to demonstrate: (1) the existence of a profitable business relationship between plaintiff and a third party; (2) that the defendant knew of the relationship and intentionally interfered with it; (3)

that the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship. E.g., Kirch v. Liberty Media Corp., 449 F.3d 388, 400 (2d Cir. 2006). Under New York law, "an essential element of this tort is that the plaintiff would have consummated a contract with another person but for the interference of the defendant." See Sch. of Visual Arts v. Kuprewicz, 3 Misc. 3d 278, 288, 771 N.Y.S. 2d 804 (Sup. Ct. N.Y. County 2003) (citing Gebbia v. Toronto-Dominion Bank, 306 A.D.2d 37, 38, 762 N.Y.S. 2d 38 (1st Dep't 2003)).

Here, plaintiff has not alleged that defendants' conduct interfered with any potential contractual opportunities, nor has he otherwise asserted that he "would have received some prospective economic advantage but for [defendants'] interference." See Risley, 272 A.D. 2d at 199 (affirming grant of summary judgment for defendants on plaintiff's purported cause of action for "tortious interference with career advancement" because, inter alia, plaintiff had failed to allege that defendants' conduct had deprived him of some prospective economic advantage). Instead, he has alleged only that defendants forced him to leave his existing positions at ADL and Coney Island Hospital.[17] Plaintiff's contentions are thus insufficient as a matter of law to support a claim for tortious interference with prospective economic advantage. See Gebbia, 306 A.D.2d at 38 (affirming dismissal of plaintiff's complaint because "there was no sufficient allegation that a contract would have been entered into between plaintiff . . . and another firm but for defendants' interference"); Constantin Assocs. v. Kapetas, 17 Misc. 3d 1137(A), at *2, 851

---

[17] Plaintiff has alleged in his complaint that defendants' refusal to renew his CQ has prevented him from "obtain[ing] another job," and he asserted in his declaration that "it is nearly impossible to obtain employment" without a CQ. However, these conclusory statements are insufficient to demonstrate actual interference with a prospective business relationship. E.g., Four Asteria Realty, LLC v. BCP Bank of N. Am., Slip Copy 2009 WL 500853, at *7 (Sup. Ct. Kings County Feb. 26, 2009) (granting summary judgment because "a claim for tortious interference with prospective economic advantage must contain allegations of a specific prospective business relationship which the defendant purportedly frustrated") (citing Bus. Networks of NY, Inc. v. Complete Network Solutions, Inc., 265 A.D.2d 194, 194, 696 N.Y.S. 2d 433 (1st Dep't 1999) (dismissing cause of action where plaintiff failed to specify any prospective relationship with which defendants interfered).

N.Y.S. 2d 68 (Sup. Ct. N.Y. County Dec. 6, 2007) ("While tortious interference with prospective business relationships is actionable under New York law as tortious interference with prospective economic advantage, actions based on interference with existing business relationships require the existence of a contract.") (emphasis in original) (citing Guard-Life Corp. v. S. Parker Hardware Mfg. Corp., 50 N.Y.2d 183, 189-94, 428 N.Y.S.2d 628 (1980)). Because both potential theories for recovery on this "malicious interference with profession" cause of action fail as a matter of law, the Court dismisses this claim for relief.

## CONCLUSION

For the foregoing reasons, the Court grants defendants' motion for summary judgment in part and dismisses plaintiff's federal due process, "class of one," and race-based equal protection claims, as well as his state law malicious interference claim, with prejudice. However, the Court denies defendants' motion for summary judgment with respect to plaintiff's selective enforcement equal protection claim. The Court will set this matter for trial by separate Order.

**SO ORDERED.**

s/Brian M. Cogan
_____
U.S.D.J.

Dated: Brooklyn, New York
      May 6, 2009